(No. 35134.—

GEORGE F. QUELLMALZ *et al.,* Appellants, *vs.* FIRST NATIONAL BANK OF BELLEVILLE *et al.,* Appellees.

*Opinion filed May 22, 1959.*

LEW W. MASON, and L. HAROLD DEGNAN, both of East St. Louis, for appellants.

WALTER E. ACKERMANN, and CARL W. FEICKERT, both of Belleville, for appellees.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

Plaintiffs, three nephews and heirs-at-law of Lena Quellmalz, deceased, appeal from a decree of the circuit court of St. Clair County, in a will contest wherein the court declared the will to be a valid last will and testament of Lena Quellmalz. This decree was entered by the court after the jury had failed to reach a verdict, was discharged, and the defendants had renewed their motion for directed verdict, upon which the court had reserved its ruling. Plaintiffs filed their post-trial motion to vacate the decree, and to enter a decree for plaintiffs declaring the document not to be the last will and testament of Lena Quellmalz, or to grant a new trial. The court denied plaintiffs' motion. A freehold interest being necessarily involved, plaintiffs appeal to this court.

The plaintiffs, sons of a predeceased brother of Lena Quellmalz, filed their complaint in the circuit court of St. Clair County praying that the instrument admitted to probate in the probate court of St. Clair County as the last will of Lena Quellmalz, be set aside and declared not to be the last will and testament of the deceased. The defendants are the executor of the will, The First National Bank of Belleville, and the legatees thereunder, Clara McFarland, sister of deceased and her only other heir-at-law, Sue Schwarz, Hazel Pfeiffer, Harry McFarland. Bertha Pohle, Amanda Freshmann, St. Vincent's Hospital of Belleville, a corporation, also known as St. Vincent's Home for the Aged, St. John's Catholic Orphanage, a corporation, also known as St. John's Orphanage, and St. Paul's

Evangelical Church of Belleville, a corporation, also known as St. Paul's Evangelical and Reformed Church. The complaint alleged that at the time of making the instrument Lena Quellmalz was more than 86 years of age, was in her dotage and was physically weak and diseased, was incompetent and unable to make the instrument, and was then obsessed by and under the influence of insane delusions, rendering her incapable of making a will.

The will was executed by the deceased on April 22, 1953. By the terms thereof she provided for the payment of her debts, her funeral and burial, and directed her executor to sell her entire estate, and distribute it in the following manner: $200 to Miss Clara McFarland, $500 to Hazel Pfeiffer, $200 to Sue Schwarz, $100 to Harry McFarland, $400 to George Quellmalz, $50 to Alfred Quellmalz, $50 to Ernst Quellmalz, $200 to Bertha Pohle, $100 to Amanda Freshmann, and the residue to be divided equally among St. Vincent's Home for the Aged, St. John's Orphanage, and St. Paul's Evangelical and Reformed Church.

Plaintiffs presented numerous witnesses upon trial of the cause. Monroe Eckert testified that his wife operated a fruit store in Belleville in which he worked, that he knew Lena Quellmalz for many years but not well and that during the last few years of her life she came into his wife's store about twice a week. He said she would sit behind the counter complaining of her neighbors and of the firemen peeking in her windows, that she bought only a few stale, over-ripe vegetables and fruits, asserting she was too poor to buy anything else, that she would stare, and would have to be led out of the store. Upon objection, the court refused to permit the witness to state his opinion as to whether Lena Quellmalz was of sound mind and knew her property on April 22, 1953.

Stella Eckert, wife of Monroe Eckert, said that from September, 1951, until April 10, 1954, she operated a fruit store which Lena Quellmalz visited, complaining she was

too poor to buy anything, or to go to a doctor. She stated that Miss Quellmalz would sit and stare, never knew when to go home, would buy only trimmings and spoiled vege-, tables, and said people were peeping in her windows. Mrs. Eckert gave as her opinion, that Lena Quellmalz was of unsound mind on April 22, 1953, but she continued to trade with her.

John Erlinger, a contractor, knew the deceased ten years and had last worked for her in 1952 when he did repairs on her house. She would only permit him to do essential repair, claiming she could not afford more and could not afford to fix a building on her property for rental.

Louis Ackerman knew her for many years and saw her once or twice a week. She wanted him to trim a tree for her but said she couldn't pay for it. The retired Belleville fire chief, Albert Nebgen, knew the deceased, as she lived next door to the No. 1 Fire Station. She frequently complained to him that the firemen were in her yard or were peeking in her windows.

Standlee I. Twitchell, a physician and surgeon, had known deceased many years and last treated her as a patient on March 18, 1950. He then found her weak and becoming feeble, with high blood pressure and loss of appetite. She became more feeble during the last two or three years as his patient, but always knew him.

William Handrich, trust officer of the First National Bank of Belleville, as an adverse witness, testified that the estate exceeded $120,000 in value, of which $89,410 was cash.

Numerous witnesses appeared in defense to the complaint. The attorney who prepared the will, Oscar Becherer, testified he had known the deceased many years, had represented her as the administratrix of her brother's estate in 1944, and prepared an earlier will for her in 1945. He said she asked him to come to her home in April of 1953 to prepare a new will, that she had written notes of what she

wanted in her will, how she wished to be buried, who should officiate, that she discussed her relatives and made provisions for all of them, and wished to give the remainder to the named charities. He stated that she was of sound mind and memory on April 22, 1953.

The witnesses to the will, Edgar Baldus and Alfred Baldus, had known deceased many years and had talked with her often. They believed her to be of sound mind on April 22, 1953. Mr. and Mrs. Ed Vernier, who operated a grocery store and had deceased as a customer for about thirty years and saw her twice a week, said she was of sound mind and memory on April 22, 1953. Of like opinion were Dr. Charles Baumann, who treated her as a patient from August 7, 1946, to January 21, 1954; Edward Blaies, who did odd jobs for her from 1948 to the spring of 1953; Emma E. Kunz who visited with her at least once a week during the last five years of her life; Phroso B. Schmidt who saw and conversed with her once or twice a month from 1950 to 1954; Fred Schmidt who sold and delivered oil to her in 1952 and 1953; and Cleola Hartell who knew her all of his life and saw and conversed with her several times in 1953.

The manager of the safety deposit department of the First National Bank testified her records showed that deceased entered her deposit box twenty-five times in 1953, and made many visits each year.

In rebuttal the plaintiffs proved that the witnesses to the will owned stock in the First National Bank of Belleville on the date they witnessed the will, and a saleslady in Vernier's grocery testified she did not remember seeing the deceased in the store in 1953 and before.

Plaintiffs here urge that the court erred in entering a decree upon defendants' motion, and that the court erred in denying plaintiffs' post-trial motion to vacate and set aside the decree and order a new trial.

The questions raised by the plaintiffs are so related that

the determination of one will necessarily result in the determination of the other. Here the jury retired but was unable to reach a verdict. Upon renewal of defendants' reserved motion for directed verdict, the court entered its decree. Thereafter, the court denied plaintiffs' motion to vacate and set aside its decree and enter a decree in favor of the plaintiffs, or in the alternative to order a new trial. A motion for directed verdict and a motion for judgment notwithstanding the verdict raise the same questions: whether as a question of law all the evidence in favor of the contestant, considered as true, together with all of the legitimate inferences drawn therefrom, tends to prove the contestants' case. (*Creager* v. *Weimer,* 13 Ill.2d 217, 218; *Hunt* v. *Vermilion County Children's Home,* 381 Ill. 29, 31.) Neither the trial court nor this court may weigh the evidence. However, if no evidence is introduced tending to prove the allegations of the complaint, or if but a bare scintilla of evidence has been adduced, the court should grant a motion by defendants for a directed verdict, and should deny a contestant's motion in the nature of a motion for judgment notwithstanding the verdict. *Peters* v. *Catt,* 15 Ill.2d 255.

It is necessary, therefore, that we examine the evidence adduced in favor of the plaintiffs. Of all the witnesses produced by plaintiffs in support of their allegations, only Stella Eckert testified that Lena Quellmalz was of unsound mind and memory on the day her will was executed. The court refused to permit her husband, Monroe Eckert, to give his opinion as to the state of the mind and memory of deceased on April 22, 1953. Plaintiffs urge error in this regard. A person who is not an expert may give his opinion concerning the mental capacity of a testator if it appears that the witness has an acquaintance with the person whose competency is in question, and relates facts and circumstances which afford reasonable ground for determining the soundness or unsoundness of mind of such person.

Whether the facts stated form a sufficient basis for such an opinion is a question for the trial court to determine, and unless that court has abused its discretion we will not reverse the decree on that point. *Ergang* v. *Anderson,* 378 Ill. 312.

The court permitted rather expansive latitude in the direct examination of Monroe Eckert, but he related few details of facts and circumstances giving rise to a sound basis for his opinion of the mental capacity of Lena Quellmalz. He observed her enter the store at times, conversed with her, heard her complain, and observed that she bought little and cheaply. Nothing in his testimony relates to any observations or conversations near the time of the execution of the will, and his relation of conversations and acquaintance with the deceased is very general. We cannot say that the court abused its discretion in refusing to permit this witness to testify in regard to the mental capacity of the deceased.

The testimony of Louis Ackerman shows that she could transact business, knew when her property needed upkeep, conversed as a neighbor and about the weather, and was very frugal. Albert Nebgen merely proved that she knew her property lines, was aware of her rights therein, and frequently conversed with him, saying that the firemen who went upon her property were looking in her windows.

John Erlinger confirmed that she could transact business, knew when her home needed repairs, and was extremely frugal and claimed not to have sufficient money.

Dr. Standlee Twitchell did not treat the deceased after 1950, and only saw her on the street and observed she became more feeble.

None of these witnesses supplied any evidence of lack of testamentary capacity in Lena Quellmalz on April 22, 1953, except Stella Eckert. In fact, if anything, they tend to confirm that deceased was capable of executing a will on that date. All that is required of a testator in order to

have testamentary capacity is that he have sufficient mental ability to know and remember who are the natural objects of his bounty, to comprehend the kind and character of his property and to make disposition of that property according to some plan formed in his mind. (*Morecraft* v. *Felgenhauer,* 346 Ill. 415.) Where a person has sufficient mental capacity to transact ordinary business and act rationally in the ordinary affairs of life, he has sufficient mental capacity to dispose of his property by will. *Shevling* v. *Jackson,* 5 Ill.2d 43.

The will itself establishes that Lena Quellmalz knew the natural objects of her bounty. She named her only surviving sister, all of her nieces and nephews, and several cousins as legatees. It is apparent from the will and the testimony of her attorney that she had a plan in mind for the disposition of her property, as she had made written notes of her desires and intentions. Moreover, the will and the testimony of Albert P. Nebgen show that Lena Quellmalz knew the character and extent of her property.

The plaintiffs' witnesses thoroughly show that she had sufficient ability to transact ordinary business. That she lived frugally and miserly, was afraid, and believed the firemen who came upon her property were looking in her windows is evidence of eccentricity, not uncommon to such an elderly woman, living alone. Eccentricity does not constatute unsoundness of mind. Old age brings on peculiarities, but peculiarities are a long way from unsoundness of mind. (*Morecraft* v. *Felgenhauer,* 346 Ill. 415.) Neither old age and feebleness, nor miserly habits, of themselves, show a lack of testamentary capacity. *Forberg* v. *Maurer,* 336 Ill. 192; *Challiner* v. *Smith,* 396 Ill. 106; *Mosher* v. *Thrush,* 402 Ill. 353.

It appears that plaintiffs' attempt to show that the deceased suffered from insane delusions (1) when she stated she had no money, at a time when she had real estate, investments, and much cash, and (2) when she believed the

firemen were looking into her windows. An insane delusion that will avoid a will must affect or enter into the execution of the will, and even if the testator does have an insane delusion on certain subjects, still if he had mental capacity to know his property and the objects of his bounty and to make a disposition of his property according to a plan formed by him, the will cannot be set aside on the ground of mental incapacity. (*Roller* v. *Kurtz*, 6 Ill.2d 618.) Moreover, an insane delusion does not exist unless the fallacy of such belief can be demonstrated. (*Scott* v. *Scott*, 212 Ill. 597.) There is no proof that the firemen were not looking in the windows or that they did not appear to do so. In addition, nothing presented in plaintiffs' evidence indicates that testator had any insane delusion which, in any way, affected or entered into the execution of this will.

The law presumes every man to be sane and of sound mind until the contrary is proved. (*Morecraft* v. *Felgenhauer*, 346 Ill. 415.) Plaintiffs were confronted with that presumption, and only the opinion of Stella Eckert rebuts it. Stella Eckert's statement is the only matter appearing in plaintiffs' evidence, with all of its logical intendments, that indicates that Lena Quellmalz was lacking in testamentary capacity on the date she executed this will, and amounts only to a bare scintilla of evidence in support of plaintiffs' cause. The trial court, therefore, was correct in granting defendants' motion for directed verdict and denying plaintiffs' post-trial motion.

The decree of the circuit court of St. Clair County is, therefore, affirmed.

*Decree affirmed.*